| 86 | 525 |
| 120 | 138 |
| 22a | 288 |
| 22a | 289 |

## PHILANDER L. CABLE

### *v.*

### THOMAS B. ELLIS *et al.*

1. RESCISSION — *of contract of sale, by vendor.* Where a party who had bargained and sold property for the amount he had paid in on the same, brought suit at law against the vendee to recover in respect to the property sold, but not to recover back such property, which suit was afterwards dismissed, the bringing of such suit was *held* not to amount to a rescission of the contract by the vendor.

2. SAME — *estoppel to insist on, by party's acts.* Where a party, under a contract of purchase, takes immediate possession of the property and continues to retain and enjoy the same all the time, he will be precluded from insisting that the bringing of a suit at law by the vendor was a rescission of the contract, as well as from setting up the failure of the vendor to perform the contract literally on his part where no injury is shown to have resulted therefrom.

3. SAME — *must place other party in statu quo.* Usually, before a party can rescind a contract, he must restore, or offer to restore, what he has received on the contract, and place the opposite party in the same situation he was at the time the agreement was entered into. He can not claim the benefits of a contract and yet insist upon its rescission.

4. POSSESSION. Where a party holding a mortgage on real estate receives possession of the property from a grantee of the mortgagor before the mortgage debt is due, under a contract of purchase, he can not afterwards be allowed to claim such possession to be under his mortgage. Good faith requires the surrender of possession thus obtained before claiming to hold under the mortgage.

**526**     CABLE *v* LLIS *et al.*     [Sept. T.

S; bus.

**5.** MORTGAGE — *priority* — *postpo* : *nt of prior one by subsequent acts.* Where A and B gave a mortgage on ll property to C, to secure the payment of a debt due C, and A and B afterw: , sold and conveyed the same property to D, subject to this mortgage, the ) nent of which D assumed as a part of the contract price, and D gave a mc i ge to A and B for the balance of the price due them, and D afterwards ld the same mill property to C and another, for the sum paid in by him he same, and the written contract pro- vided that all the notes and mort ; s held by the parties to the contract should be canceled, it was *held* tha prior mortgage of A and B to C was postponed to that given by D to A a: : , it be ng the intention to cancel the first so as to give the second the supe lien.

**6.** SAME — *revived by subsequent ((* Where a mortgagee, by contract of purchase, had agreed to cancel his r i gage cn the property purchased, and afterwards assigned and transferred t u ortgage, with the written consent of one of the several mortgagors, whereb; he assignee was induced to dismiss a creditor's bill filed by him against th mortge gor and the mortgagee, it was *held* that the mortgagor so giving his insent, by inducing the acceptance of the mortgage as a valid security and p: ocuring the dismissal of the creditor's bill, revived the mortgage, so far as he w is concerned, in favor of such assignee, but could not as to the other mortgagor.

**7.** SAME — *priority.* A and B, being the owners of mill property and other real estate, gave a mortgage on the mill property to C, to secure the payment of a note, after which they sold and conveyed all their property to D, the mill property subject to the mortgage, which D assumed to pay, and D gave A and B a mortgage on both the mill property and the other real estate to secure the balance of the purchase money. D afterwards sold the whole property to C and E for the amount he had advanced or paid on the same, the parties to the contract agreeing to cancel all mortgages held by them on the property. A after- wards consented, in writing, that C might assign the first-named mortgage to F, who was thereby induced to dismiss a certain creditor's bill filed by him, and the assignment was made to secure F's debt; and A and B assigned the mortgage by D to them to G: *Held,* on bills to foreclose these mortgages by the several given assignees, and on bill by D to enforce a spec fic performance of the contract of sale to C and E, that the assignee of the second mortgage was entitled to priority in payment over the first mortgage, and that the assignee of the first mortgage, as to the mill property, was next entitled to payment, and that D was next entitled to be paid the amount due him, and that any surplus should be paid to C as the owner of the equity of redemption.

**8.** SPECIFIC PERFORMANCE — *decree, when personal.* Where one of the pur- chasers of real and personal property, on a disagreement as to the price to be paid, notified the vendor that he would have nothing more to do with the con- tract of sale, and afterwards had to do only in selling the personalty with his co-purchaser, and finally sold out his interest therein to the latter, it was *held,* on bill by the vendor to enforce payment, that he was entitled to a personal decree against such purchaser to the extent of the amount of the goods received by both purchasers, with ten per cent interest, to make up any deficiency, if any, in respect to the other property on its sale.

**9.** CROSS-ERRORS — *what may be assigned.* Where three suits in chancery

relating to the same property are consolidated, and thereupon one of the complainants files an amended and supplemental bill, reciting specifically and in detail all the proceedings in the three suits, reiterating his prayer for relief as in his original bill, the latter may, on appeal by one of the other complainants, assign for cross-error any decree, or refusal of decree, to his prejudice.

10. SPECIFIC PERFORMANCE — *decree* — *priority.* Where a party in selling real estate is to be indemnified against the payment of a mortgage given by him prior to the sale, he will be entitled to have any payments made thereon after the sale refunded to him before the mortgagee, the purchaser, receives anything from the sale of the property to satisfy such mortgage and other claims.

APPEAL from the Circuit Court of Peoria County.

In 1856, John M. Waugh was the owner of about 480 acres of land at Richland Grove, in the county of Mercer, in this State. He kept a store, and wished to build a steam flouring mill. For this purpose Benjamin T. Sisson, his son-in-law, joined him, under an agreement, by which Sisson was to own a half interest in the mill. In February, 1858, before the mill was completed, Waugh sold out and conveyed an undivided half of the land to Henry B. Ellis, his brother-in-law, and son-in-law also; thereupon Waugh and H. B. Ellis executed a mortgage on the mill and mill lot — the lot containing about two acres bounded by certain defined lines — to Sisson to secure to him the payment of the sum of $9,280 with ten per cent per annum interest, on or before July 20, 1862, that being the sum of money he had advanced in the erection of the mill, which was his entire interest in the property.

In the building of the mill T. B. Ellis & Bros. of St. Louis, (of which firm Thomas B. and Henry B. Ellis were members, they being brothers, and Thomas B. also being a brother-in-law of Waugh) sold to Waugh & Sisson a large amount of machinery and fixtures for the mill, and afterward they sold to Waugh & Ellis machinery amounting to about $2,000. Waugh was also engaged in retailing dry goods, and he and Henry B. had become involved in debt, not only to T. B. Ellis & Bros., but to others. Waugh wrote to T. B. Ellis, at St. Louis, to come up and bring his brother Henry B.

with him, stating that the business was in bad condition, and he wanted them to come up and put it in some shape that T. B. Ellis would not lose his claim. T. B. Ellis, with his brother H. B., accordingly went up, and the result was that T. B. Ellis made a purchase in form of the entire concern, mill, lands, store, horses, hogs, mules, wagon, harness, etc., and a five acre tract with a house thereon, on which Waugh lived. The price fixed for the partnership property of Waugh and H. B. Ellis was $32,269.54, and for the Waugh house and five acres, $1,140. From the first sum was deducted the Sisson mortgage, $9,280, which was assumed by T. B. Ellis, and the T. B. Ellis & Bros. account for $8,000. This left a balance coming to Waugh & Ellis of $14,989.54. Thereupon Waugh and H. B. Ellis, and their wives, on May 5, 1858, conveyed all the lands, including the mill, to T. B. Ellis, except the five acres, for the expressed consideration of $26,417.65, subject, however, to the Sisson mortgage, which T. B. Ellis assumed, and T. B. Ellis executed to Waugh and H. B. Ellis his notes for said sum of $14,989.54, and a mortgage back on the lands and mill so conveyed, to secure the payment thereof. Waugh also at the same time executed to T. B. Ellis a deed for the said five acre tract and house, and T. B. Ellis executed to Waugh individually his note for $1,140, and a mortgage to secure its payment on the last tract. T. B. Ellis gave Waugh a power of attorney to carry on the business, and departed to St. Louis. Afterward, being dissatisfied with Waugh's management, he came up to the mill, and revoked Waugh's power of attorney, and carried on the business himself some time, and then, on September 30, 1858, sold out, as he says, to Waugh, Sisson, and one John B. Rathbun, also a brother-in-law of Waugh, all the property, real and personal, on the terms stated in a certain contract in writing of that date signed by Sisson and Rathbun, of the second part, and Thomas B. Ellis, of the first part, which contract is set out at length in the opinion in the case of *Sumner et al.* v. *Waugh et al.*, where a portion of this controversy was involved, 56 Ill. 531; and we

will refer thereto and save repetition here. There having been a failure, through disagreement of the parties, in the entire consummation of this contract of September 30th, Thomas B. Ellis, on March 26, 1861, filed his bill in chancery in the circuit court of Mercer county, against Sisson, Rathbun and Waugh, to set aside and cancel the two mortgages above named from Waugh and H. B. Ellis to Sisson, and from T. B. Ellis to Waugh and H. B. Ellis, and to compel Sisson and Rathbun to give T. B. Ellis security for the purchase money of the premises sold by him to them by the contract of September 30, 1858, it being claimed that he was entitled to such relief under that contract. Afterward, while such suit was pending, on February 8, 1862, Sisson assigned his mortgage to Sumner & Co., who, on February 8, 1862, commenced a suit in chancery in the circuit court of Mercer county for the foreclosure of the same, making T. B. Ellis, Henry B. Ellis, Sisson, Waugh, and others defendants. T. B. Ellis and Henry B. Ellis answered this bill, and all the others were defaulted. T. B. Ellis also filed a cross-bill. Sisson, Rathbun and Waugh answered the bill of T. B. Ellis. In 1865 the venue in both cases was changed to Peoria county, where they remained until July, 1869, when a hearing was had of the case of Sumner & Co., and the bill of Sumner & Co. and the cross-bill of T. B. Ellis were both dismissed.

From this decree Sumner & Co. took an appeal to this court, and the decree was reversed, it being the case in 56 Ill. 531, above referred to. After the cause was remanded, Sumner & Co. filed an amended and supplemental bill, to which answers were filed by the Ellises and by Waugh. After the decision of this court in the Sumner & Co. case, and while that case and the bill of T. B. Ellis were still pending, some time in 1872, Waugh assigned to P. L. Cable the aforementioned notes and mortgage executed by T. B. Ellis to Waugh and H. B. Ellis on May 5, 1858. Cable then filed a bill in chancery June 29, 1872, in the circuit court of Mercer county, to foreclose that mortgage, making

the Ellises and the parties to the other two suits, except Rathbun, parties. The venue in that cause was also changed to Peoria county, where answers were filed by the Ellises, Waugh, Sumner & Co., and Sisson.

In 1872 the court below, on motion of T. B. Ellis, consolidated the two causes, wherein Sumner & Co. and Cable were respectively complainants, with the cause wherein he, T. B. Ellis, was complainant. T. B. Ellis then filed an amended and supplemental bill, making all the parties in interest defendants, with the exception of Waugh, who had in the meantime died, and his heirs were made parties. Answers were filed by the new parties to this bill, and replications thereto. Sisson then filed a cross-bill, which was answered, and replications filed.

All the said suits came on for hearing together in April, 1875, and the court decreed that Sumner & Co. had a first lien to the amount of their claim upon the mill and mill lot described in the mortgage given by Waugh and H. B. Ellis to Sisson, and by him assigned to Sumner & Co., and that Sisson was entitled to the benefit of the residue of said mortgage, and that Sumner & Co. recover against H. B. Ellis and the estate of Waugh, $25,209, to be paid within ten days, with costs ; in case of default to make such payment, the mill and mill lot to be sold ; that Thomas B. Ellis had a first lien upon the lands described in his bill, except the five acres (Waugh's house) and the mill, for $19,930 ; that Thomas B. Ellis was not entitled to the specific performance of the contract of September 30, 1858, and Sisson and Rathbun were not liable to Ellis upon that contract, and that the notes and mortgage ($14,989.54) made by Thomas B. Ellis to Waugh and H. B. Ellis could not be enforced against the latter.

Cable appeals from the decree.

Thomas B. and Henry B. Ellis assign cross-errors in the giving Sumner & Co., instead of Thomas B. Ellis, a first lien upon the mill property ; in refusing any decree against Sisson or Rathbun under the contract of September 30, 1858,

and in rendering a personal decree against Henry B. Ellis for $25,209.

This general outline, without a more particular detail of the voluminous pleadings and various facts, will serve to give a general idea of the subject matter of the controversy.

Mr. H. W. WELLS, for the appellant.

Messrs. McCULLOCH & STEVENS, for the appellees T. B. and H. B. Ellis.

Messrs. JAMES & JACK and Mr. H. M. WEAD, for the appellee J. B. Rathbun.

Mr. E. S. SMITH, for Sumner & Co.

Mr. JUSTICE SHELDON delivered the opinion of the Court :

The question here presented for determination is principally one between T. B. Ellis, Sumner & Co., and Cable, as to the priority of their respective equities.

The Sisson mortgage was first in point of time. T. B. Ellis took his deed of May 5, 1858, subject to the payment of that mortgage, and that mortgage which Sumner & Co. now hold by assignment is entitled to priority as respects the mill and mill lot which it is upon, unless its precedence has been displaced by the contract of September 30, 1858, entered into between T. B. Ellis of the one part, and Sisson and Rathbun of the other part.

That contract, though in some of its parts obscure and almost unmeaning, is in other portions clear and unambiguous. It distinctly purports to be an agreement by T. B. Ellis " to sell and convey to the said parties of the second part all his paid-in interest in the Richland Grove steam mill, store, and lands attached to the same, amounting to ten thousand dollars more or less, as shall appear from authenticated bills rendered at the final closing up of this contract, which shall take place within three weeks from this date," and to yield up

532        ·        CABLE *v.* ELLIS *et al.*        [Sept. T.

Opinion of the Court.

to them all the said premises at the signing of the contract; and Sisson and Rathbun agree " that they will make over the balance, after deducting the amount held by Benjamin T. Sisson, $9,280, and the said ten· thousand dollars more or less paid in by the said party of the first part, and sold to John B. Rathbun (he agreeing to pay the same) by mortgage on the premises " as they might agree with John M. Waugh; and it was further agreed "that all the parties named in this article shall deliver up all bonds, mortgages, deeds, and receipts and papers of whatever kind relating to this contract so soon as the same are lawfully canceled." This court, in the case of *Sumner et al.* v. *Waugh et al.*, when that was before us, put an interpretation upon this contract, so far as it respects the Sisson mortgage, and it was held that the Sisson mortgage was a part of the purchase price of the premises; that, as possession had been taken of the premises upon the making of the contract, as provided by its terms, and such possession had not been surrendered, it was not in the power of Sisson to rescind the contract, and he was bound, under the terms of the contract, to deliver up the mortgage to be canceled. And it was further held that the pendency,.at the time Sumner & Co. took the assignment of the Sisson mortgage, of the suit commenced by T. B. Ellis, March 26, 1861, to enforce the contract of September 30, 1858 — in the bill wherein the contract was set out — was notice to Sumner & Co. of the equities of T. B. Ellis, and that they took the assignment of the mortgage subject thereto; and that neither Sisson nor Sumner & Co., his assignees of the mortgage with notice, could set up the Sisson mortgage as prior to the lien of T. B. Ellis.

We find no reason for changing the conclusion which we then reached, and it establishes the priority of the equity of T. B. Ellis over the Sisson mortgage, unless, since the remanding of the case of *Sumner et al.* v. *Waugh et al.*, and a further hearing had in the court below, the introduction of additional testimony has changed the·phase of the case.

When the case of *Sumner et al.* v. *Waugh et al.* was before us, the point was made, that T. B. Ellis had rescinded the contract of September 30, 1858, by the act of bringing a suit in December, 1858, in the Rock Island circuit court, against Sisson & Rathbun, to recover the amount of his "paid-in" interest, and the remark was made in the opinion that if that were so, that if the suit had been brought by Ellis to recover his advances which made up his "paid-in" interest, it would have been an election, and would have amounted to a rescission of the contract, on the authority of the case of *Herrington* v. *Hubbard*, 1 Scam. 569 ; but it was said that the record furnished no evidence of the nature or purpose of that action, and we could not say that it was of such a nature as to operate as a rescission. On the rehearing of the case of *Sumner et al.* v. *Waugh et al.*, in the court below, there was introduced the record of the Rock Island suit. All that it shows is that a suit was commenced November 10, 1858, by T. B. Ellis against Sisson & Rathbun, that a declaration in *assumpsit* containing only the common counts for goods sold and delivered, etc., was filed, without any bill of particulars ; that a plea of the general issue was filed, and, without anything more, the suit was dismissed by the plaintiff at the May term, 1859.

There was the testimony of the attorney who brought the suit, that he thought it was brought for money T. B. Ellis claimed to have paid in for machinery in a mill ; and of T. B. Ellis, that he sued for the amount of his bills as damages. It was doubtless the above-mentioned remark made by this court in regard to that suit as operating to rescind the contract of September 30, 1858, which led the court below to depart from the former judgment of this court that T. B. Ellis had the prior equity, and to decree that Sumner & Co. had the prior equity. As the former record, when here, furnished no evidence of the nature or purpose of the suit in the Rock Island court, the remark as to what might have been the effect had the suit been brought for the purpose there supposed, was unnecessary, and evidently but slightly

considered. It was there supposed that the case of *Herrington* v. *Hubbard*, 1 Scam. 569, would control.

But that was the case of a *purchaser*, under an unexecuted contract for the purchase of real estate, bringing suit to recover back the purchase money which he had paid under the contract. That was evidently an act in distinct renunciation of the contract of purchase. But the case here was different. It was the case of the vendor suing the vendees to recover in respect to property sold to them. The action, it is true, was misconceived as one brought upon the contract of September 30th, as that was under seal, the time of payment had not arrived, it being seven years; and the express agreement to pay was on the part of Rathbun alone. Still it was a suit by the vendor against the vendees, or at least a vendee, to recover for the property sold, and for an indebtedness, not to recover back any of the specific property. It was clearly not such a distinctive act of repudiation of the contract as that in the case of *Herrington* v. *Hubbard*. But, however this may be, we are of opinion that Sisson, by the taking of immediate possession of the property under the contract of sale of September 30, 1858, and ever since having retained it and enjoyed the benefit of the property, is precluded from insisting that there was a rescission of the contract by T. B. Ellis in his bringing such suit in the Rock Island circuit court, as well as from setting up the non-compliance claimed on the part of T. B. Ellis with the terms of the contract. ·

Immediately upon the execution of the contract of September 30, 1858, T. B. Ellis departed for St. Louis to procure the authenticated bills of the machinery and goods he had furnished, in order to ascertain the precise amount of the purchase money which Rathbun was to pay; which bills by the contract were to be rendered within three weeks. He also took with him a certified copy, furnished by Waugh, of the mortgage from T. B. Ellis to Waugh and H. B. Ellis, to have H. B. Ellis execute a release of the same. Within the three weeks he returned, bringing the release executed by H. B. Ellis, and the original bills

receipted.   Rathbun took exception to the bills as being of a larger amount than he had expected, and was willing to allow.   Reference was made to Waugh, who examined them, and threw out three of them as objectionable.   Several days were spent in trying to effect a settlement.   T. B. Ellis offered to settle, leaving out the bills thrown out by Waugh for future adjustment.   Objection was made, further, that the bills were not authenticated, and, seemingly for the latter reason, the parties being together on the last day of the three weeks, failed in making a settlement as to the bills, and separated.   There is evidence that Rathbun said then he would have nothing further to do with the contract.   November 10th thereafter, T. B. Ellis brought the suit in the Rock Island circuit court.   In March, 1861, previous to T. B. Ellis filing his bill herein to enforce the contract of September 30th, Mr. Thompson, for T. B. Ellis, made a tender to Sisson & Rathbun of a deed from Ellis and his wife of the property described in that contract, and also presented to them bills of the machinery and goods furnished by T. B. Ellis, verified under oath.   This seems to be all which the evidence discloses as having taken place between the parties subsequently to their separation as aforenamed, and up to the time of the filing of said bill by T. B. Ellis.

By the terms of the contract of September 30th, possession of the property, thereby agreed to be sold, was to be yielded up to Sisson & Rathbun at the signing of the contract.   The possession was so yielded up, and has never been surrendered, or offered to be surrendered, back; but, on the contrary, has been ever since retained, and the whole benefit of the property enjoyed by Sisson, Rathbun, and Waugh, among them.

The amount of the goods, according to the invoice made October 5, 1858, was $3,640.77.

Among the property sold was some shafting, at the time in possession of Langley & Co., at Rock Island, for which T. B. Ellis gave to Sisson & Rathbun an order dated Octo-

ber 18, 1858. This order they did not return or offer to return, but refused to do so, and some time after the final failure, as before named, to complete the contract, Sisson & Rathbun replevied the shafting from Langley & Co., and put it into the mill.

The vendees here have enjoyed all the benefits of the contract of purchase in as full manner as if the vendor T. B. Ellis had performed the contract to its very letter. He did perform, substantially, within the limited time of three weeks. He procured and presented the original bills of machinery and goods he had purchased and put in the mill and store, which formed his paid-in interest. The bills are shown to be just and correct. It seems he regarded them as authenticated bills. If they were not authenticated bills within the meaning of the contract, that was but a circumstantial non-compliance, which in no way interfered with the enjoyment of the full benefit of the contract by the vendees. Ellis was ready to execute the deed.

It seems to be no just objection that he could not make a good conveyance by reason of his mortgage to Waugh and H. B. Ellis, which was resting upon the property. It was, doubtless, the true understanding that that mortgage, as respected T. B. Ellis, was to be released. H. B. Ellis had executed a release of it.

Richard Ellis testifies that on that objection being named by Sisson & Rathbun, that T. B. Ellis " could not give them a good title no how," the latter turned to Waugh and inquired if he could not; to which Waugh responded: " Yes, if I release ;" and, being asked if he was not going to release, he replied that he would, if T. B. Ellis and Sisson & Rathbun would settle about the bills.

The goods and personal property, constituting a large part of the whole property, were received and fully appropriated and disposed of by the purchasers. Usually, before a party can rescind a contract he must restore, or offer to restore, what he has received on the contract, and place the opposite party in the same situation as he was at the time

the agreement was entered into between the parties. A party has no right to claim all the benefits of the contract, and at the same time insist that it is rescinded. *Gehr* v. *Hagerman*, 26 Ill. 441; *Sanford* v. *Emory's Administrator*, 34 id. 468.

By this contract of September 30, 1858, as this court has before construed it, this Sisson mortgage constituted a part of the purchase price of the property, and while he held the property he was bound to deliver up the mortgage to be canceled. After all this enjoyment and use of the property, and no offer to restore it, it would be manifestly inequitable to permit Sisson to enforce his mortgage as against T. B. Ellis; and Sumner & Co., his assignees of the mortgage with notice, occupy no better position.

To evade the force of such possession and enjoyment of the property, the claim is set up, as respects the goods, that they were purchased by Waugh, and not by Sisson & Rathbun; and, as respects the mill property, that Sisson was holding possession of it under his mortgage.

Waugh, Sisson, and Rathbun do testify that the goods were sold to Waugh, not to Sisson & Rathbun; and Griffith, who was a clerk in the store for T. B. Ellis before the contract of September 30th, and for Sisson & Rathbun, employed by them, for some three months afterward, testifies that he understood that Waugh took the goods back from Ellis about the last of September, 1858; that Waugh, about October 1, 1858, sold the goods to Sisson & Rathbun.

It appears there was a purchase of the store by Sisson & Rathbun from Waugh, but the note in evidence given for the purchase bears date October 25, 1858. On one of the mortgage notes of T. B. Ellis to Waugh and H. B. Ellis there was an indorsement made by Waugh, October 11, 1859, after the dispute arose, and by the advice of counsel, of $3,502.52, as being for store and chattels returned to him October 1, 1858.

Waugh, in his first deposition in the case, testified that after the execution of the contract of September 30, 1858,

in the evening, T. B. Ellis started for St. Louis the next
morning, leaving him in the store to take an inventory of
the goods; that he had the key to the store and considered
himself in possession; that Sisson succeeded T. B. Ellis in
the mill, and Rathbun & Sisson in the store; that Rath-
bun & Sisson received possession of the store and goods
then, in the first place, from him. That he gave them pos-
session by authority given to him by T. B. Ellis. That he
was to deliver the store and goods to Sisson & Rathbun,
and they were to have seven years to pay for them, and
were to pay to him and he was to indorse it on one of the
notes of T. B. Ellis to Waugh and H. B. Ellis. That two
or three days after making the contract Sisson & Rathbun
sent to Boston for goods for the store. The invoice made of
the goods by Waugh, and Griffith, the clerk, is dated Octo-
ber 5, 1858, and on its face shows J. M. Waugh to be
debtor to Sisson & Rathbun for the entire amount. T. B.
Ellis denies that he made the sale of the goods to Waugh
alone, but testifies that he sold the whole property together
to Sisson & Rathbun, or, rather, that the sale was really
made to all three of them, and Waugh's name kept out of
the written contract by arrangement between the parties.
This store was kept in one end of the mill, and seems to
have been kept in connection with it. The probability is,
from the circumstances, that all the property was sold
together. But what should settle the question, as being the
best evidence upon the subject, the written contract of Sep-
tember 30th expressly names that the store, as well as the
mill and lands, was embraced in the sale to Sisson & Rath-
bun.

As respects possession of the mill, the mortgage of Waugh
and H. B. Ellis to Sisson, which T. B. Ellis on his pur-
chase of the property assumed the payment of, did not
become due until July 20, 1862.

Sisson, when he received possession of the mill property
from T. B. Ellis, upon the making of the contract of Sep-
tember 30, 1858, received such possession under the con-

tract, and not under the mortgage ; and the claim that, upon the failure to complete the contract within three weeks afterwards, thenceforth, and ever since, Sisson has been holding the possession, not under that contract, but under his mortgage, which would not mature until July, 1862, seems to be but a mere pretension, and entitled to no serious consideration.

To be sure, Sisson says he held possession under his mortgage, but he never communicated any such idea to T. B. Ellis, the holder of the equity of redemption, and who had assumed payment of the mortgage. Good faith required at least this, if not the surrender to Ellis of the possession he had received from him under the contract of September 30th, before undertaking to hold the possession under the mortgage.

We find, then, that there is nothing in the claim that the sale of the goods was to Waugh alone, or that the holding of the possession was under the Sisson mortgage, which should detract from the just force and effect of the possession and enjoyment of the property in their operation to preclude Sisson from insisting that the suit brought by T. B. Ellis in the Rock Island circuit court amounted to a rescission of the contract of September 30th, or that Ellis had not complied with the contract.

And hence we remain of the same opinion now as before, that the contract of September 30, 1858, postponed the Sisson mortgage to the Waugh and Ellis mortgage.

It was doubtless the intention of the contract of September 30th that this latter mortgage also, as well as the former, should be canceled, so as to give to T. B. Ellis a superior lien upon the property for the security of the payment of his paid-in interest, and for the carrying out of such intention, and being impressed with the justice of the claim of T. B. Ellis that he should have such security, we have anxiously sought for some satisfactory ground upon which we might rest the support of such a claim, but we have not been able to discover any.

It will not do to say that the intention from the beginning was only to give T. B. Ellis a security upon the property for the payment of the advances which he had made, and assign only that character to the transactions had between the parties. The form of the transaction of May 5, 1858, between T. B. Ellis and Waugh and H. B. Ellis was a purchase and sale, and not a security, and we find no sufficient warrant for pronouncing it to be different from what the parties by their writings and acts have expressed it to be.

The written contract of September 30, 1858, was not signed by Waugh, and we can not hold him as bound by that contract to discharge and release his mortgage, although we may strongly suspect there was a secret understanding to that effect.

It is set up by T. B. Ellis that Waugh accepted Sisson and Rathbun in lieu of T. B. Ellis, as his debtors for the sum due to him on the Waugh and Ellis mortgage, and that the same has been paid to Waugh by Sisson and Rathbun. We find no sufficient proof in support of such a claim.

It does appear that Waugh and Sisson had large dealings with each other, and that Sisson assumed the payment of, and did pay, some $7,000 of claims against Waugh, but the proof fails to show that this had any connection with the Waugh and Ellis mortgage, or with the contract of September 30th, or should be taken to lessen to any extent the amount due on said mortgage. Sisson and Rathbun do by the contract of September 30th assume the payment of several enumerated bills of goods owing by T. B. Ellis, but the contract is entirely silent in regard to any assumption of payment of this Waugh and Ellis mortgage.

It appears that at the time of the filing of the original bill of T. B. Ellis, Sisson then had in his hands these notes and mortgage of T. B. Ellis to Waugh and Ellis held as collateral security for two certain claims against Waugh that Sisson had assumed the payment of, which notes and mortgages were afterwards delivered back by Sisson to Waugh; and it is supposed that the notes and mortgage having been

thus in the hands of Sisson at the time of the filing of the bill, they became affected with the equity of T. B. Ellis, at least to the amount for which they were held as collateral and which Sisson paid, to have them postponed to his claim of a lien for his paid-in interest.

We are unable to see that this circumstance should have subjected the notes and mortgage to the consequence supposed.

We find, then, that this Waugh and Ellis mortgage is entitled to be first paid.

But when it comes to the paying over to Waugh of the amount of this mortgage, a rival claim to the money arises on the part of Sumner & Co., growing out of a transaction in connection with the assignment to them of the Sisson mortgage, which has not as yet been adverted to. When this assignment of the Sisson mortgage was made to Sumner & Co., there was a creditor's bill pending against Sisson & Rathbun, which had been brought by Sumner & Co. upon two judgments, one against Sisson, the other against Sisson & Rathbun. The judgment against Sisson was against him as indorser of Waugh. On application by Waugh to Sumner & Co. to take security for their claim and, dismiss their creditor's bill, they accepted an assignment of the Sisson mortgage and dismissed the creditor's bill, Waugh at the same time, with the assignment, executing to Sumner & Co. the following instrument in writing:

"Whereas, Benjamin T. Sisson has this day assigned a certain indenture of mortgage executed by John M. Waugh, Mary Ann Waugh, and Henry B. Ellis and Ottilina S. Ellis, to said Benjamin T. Sisson, dated February 15, A. D. 1858, to secure the payment of $9,280.58, and recorded in the recorder's office of Mercer county, in the State of Illinois, in volume 'E' of Real Estate Mortgages, page 58, to Austin Sumner, John R. Kimball and Edwin O. Tuffts, of Boston, Mass., to secure the payment of three thousand and forty-six and eighty-eight hundredths dollars, accord-

ing to his four certain promissory notes described in said assignment.

"Now, therefore, I, John M. Waugh, in consideration of the premises, do hereby consent that the said Benjamin T. Sisson may assign the said mortgage, on which there will be due and payable on the 20th day of July, A. D. 1862, the sum of nine thousand two hundred and eighty and fifty-eight hundredths dollars, with interest as stated in said mortgage, to the said Austin Sumner & Co., to secure the debt above described, without prejudice, and that he or they may delay the collection of said mortgage if so chosen.

"Dated this 8th day of February, A. D. 1862.

"JOHN M. WAUGH."

We think that as against Waugh himself, this instrument in writing should be held to have the effect of a revival of the Sisson mortgage to the extent of Sumner & Co.'s claim. By his representation contained in that writing, he induced Sumner & Co. to take an assignment of that mortgage and dismiss their pending creditor's bill. It was a virtual representation that the Sisson mortgage was then a valid and subsisting mortgage, and that the whole amount thereof was due and owing. Waugh should make good his representation, and, as between himself and Sumner & Co., it is equitable that the latter should be preferred in payment.

Cable having taken his assignment from Waugh of this Waugh & Ellis mortgage at a late stage of all this litigation, took subject to all equities against Waugh, and stands in no better situation than Waugh himself.

The conclusion, then, is that Sumner & Co. should first be paid the amount of their claim. Cable should next be paid the residue of the amount of the Waugh & Ellis mortgage after the deduction therefrom of the amount of Sumner & Co.'s claim.

Then T. B. Ellis should be paid the amount of his paid-in interest. Any surplus remaining should be paid over to Sisson, as the owner of the equity of redemption.

Of course, all that has been said in regard to the priority of Sumner & Co. is to be confined to the amount of the proceeds of the mill and mill-lot, the property embraced in the Sisson mortgage — their claim being limited in its extent to the property described in that mortgage.

A question is made as to the effect of the release which H. B. Ellis executed of the Waugh & Ellis mortgage on October 9, 1858; whether it was to release the one-half interest in the mortgage. Although the mortgage and the notes it secured were given to Waugh and H. B. Ellis jointly, as between Waugh and H. B. Ellis the whole equitable interest in the notes would appear to have been in Waugh. They had ever remained in his possession, and it would seem from the proofs that H. B. Ellis never put anything in the mill, or in the concern of Waugh & Ellis. We think it sufficiently appears that Waugh was the real owner of the entire interest in the notes and mortgage, and that no significance is to be given to the release in the respect named.

As respects Rathbun, it appears that at the time of the disagreement as to the settlement of the bills, he distinctly announced to Ellis that he would not have anything more to do with the contract; that afterward, he had to do with the store only, selling the goods in partnership with Sisson, until in January, 1859, when he sold out his interest in the goods to Sisson, and he seems since to have had no further connection with any of the property. We think that, as against him, under the contract of September 30, 1858, T. B. Ellis is entitled to a personal decree for any deficiency, should there be such, for the satisfaction of his claim out of the proceeds of the above-named mortgaged property to the extent of the amount of said goods received by Sisson & Rathbun, with ten per cent per annum interest thereon.

Objection is made that as Rathbun was not made a party to the bills filed by Sumner & Co. and Cable, and as Cable does not complain of the refusal by the court to decree against Rathbun, and it only concerns T. B. Ellis, and he

544       CABLE *v.* ELLIS *et al.*       [Sept. T.

Opinion of the Court.

has not appealed, but Cable only, it is not allowable to Ellis to assign this cross-error for not decreeing against Rathbun, that he can only assign cross-errors in respect to some decree as between himself and Cable to his injury. After the consolidation of the two cases of Sumner & Co. and Cable with that of T. B. Ellis, the latter filed an amended and supplemental bill, reciting specifically and in detail all the proceedings in the said three suits, reiterating his prayer for relief as made in his original bill filed against Waugh, Sisson and Rathbun upon the contract of September 30th, and making all the parties in interest, Rathbun among them, defendants. We think it was competent on this appeal by Cable for T. B. Ellis to assign for cross-error any decree or refusal of decree by the court below to his prejudice.

As respects Henry B. Ellis, there should have been no personal decree against him under the Sisson mortgage, as we hold it should be canceled under the contract of September 30,.1858, and it was beyond the power of Waugh afterward to revive it against any one but himself.

The decree will be reversed and the cause remanded for further proceedings in conformity with this opinion.

*Decree reversed.*

Per CURIAM: A rehearing was granted in this case upon petitions therefor on the part of T. B. Ellis, Cable, and Sumner & Co. We have carefully gone over the case again with an attentive consideration of the additional arguments which have been respectively presented, but fail to perceive sufficient reason to change the conclusion at which we before arrived, and must still adhere to our former opinion, save in the following particulars.

It was there said, after providing that Sumner & Co. should be first paid, and Cable next, to the extent named, "Then T. B. Ellis should be paid the amount of his paid-in interest. Any surplus remaining should be paid over to Sisson, as the owner of the equity of redemption."

At the time of the making of the contract of September 30, 1858, there were outstanding in the hands of Reynolds and Ely the first two notes in the series of notes amounting to the sum of $14.989.54, which the Waugh and Ellis mortgage was given to secure, said two notes having been assigned by Waugh to Reynolds and Ely. These two notes appear to have been paid by T. B. Ellis to Reynolds and Ely subsequently to September 30, 1858. In making distribution of the proceeds of sale, we are of opinion the amount of these notes thus paid after September 30, 1858, should be added to the claim of T. B. Ellis to be paid next after Sumner & Co. and Cable, and before the payment of anything to Sisson. As we view it, it was the intention of the contract of September 30, 1858, that T. B. Ellis should be indemnified against the Waugh and Ellis mortgage, and any payment made by him on the mortgage debt subsequent to that date should be refunded to him by Sisson before the latter receiving anything from the sale of the mortgaged property.

It is claimed that the same should be the case as to a payment of $811 made on one of the mortgage notes, September 8, 1858. But we can not extend the indemnity beyond the terms of the contract, and must hold it to apply only to the mortgage as then, at the date of the contract, existing, and not to cover any previous payment on the mortgage debt, but only subsequent ones.

In the former opinion there is this remark : "Of course all that has been said in regard to the priority of Sumner & Co. is to be confined to the amount of the proceeds of the mill and mill lot ;" in respect to which, in the petition for rehearing of T. B. Ellis, it is said "this modification could do Ellis no harm if the mill and mill lot would sell for enough to satisfy the Sumner & Co. claim. If they do not sell for that amount, then Ellis would, be greatly prejudiced." The opinion may have been misapprehended in this respect. We do not regard that Ellis would be preju-

diced if the mill and mill lot should not sell for enough to satisfy the Sumner & Co. claim.

We hold that Waugh, by his written representation in respect to the Sisson mortgage, is himself estopped to deny it to be a valid mortgage, and should be held to make it a good and valid mortgage so far as he may, to Sumner & Co. ; and that is here done by allowing to Sumner & Co., instead of to Waugh, the avails of the sale of the property embraced in the Sisson mortgage, viz., the mill and mill lot, and the exhaustion of that satisfies and ends all claim of Sumner & Co. with respect to the Sisson mortgage, and which is all the claim they have to assert in the present proceeding.

It is strenuously insisted that Sisson, as against Waugh, should be allowed for all payments made by him of indebtedness of Waugh, and Waugh and Sisson, amounting to some $7,000. If what was before said in that regard is not to be accepted as a satisfactory answer upon this point, we deem it sufficient, further, to remark that the proof shows a full settlement was had between Sisson and Waugh with respect to such payments, and a small balance found to be due in favor of Sisson, which Waugh paid and took a receipt in full, and was so judicially determined in a suit at law brought by Waugh against Sisson in the district court of Douglas county, Nebraska, where such payments were pleaded in set-off by Sisson. We find nothing in the relation of parties which should have precluded the making of such settlement.

As Waugh, on October 11, 1859, under the advice of counsel, made an indorsement of $3,502.52 on one of the mortgage notes of T. B. Ellis to Waugh and H. B. Ellis, as being for store and chattels returned to T. B. Ellis October 1, 1858, it is claimed on the part of Rathbun that thereby T. B. Ellis received pay for the goods, and that a personal decree against Rathbun for the value of the goods in favor of Ellis would be a double payment to the latter

for the goods.  But by the contract of September 30, 1858, as we find, Ellis was to be paid for his " paid-in interest " in the property, including the store, $10,000 more or less as it should appear to be, and, in addition thereto, his mortgage to Waugh and Ellis was to be discharged, or he indemnified in respect thereto ; so that any satisfaction in part or whole of that mortgage debt would be no payment of the sum contracted to be paid for the goods.  If, upon the reference to the master, it should be found that the " paid-in interest " of T. B. Ellis in the store was less than the amount of the goods received by Sisson and Rathbun, then any personal decree against Rathbun should only be to the extent of such paid-in interest in the store.